UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| CRANE 1 HOLDCO, INC., and | ) | |
| CRANE 1 SERVICES, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 2:23-CV-205-PPS-JEM |
| | ) | |
| CONTINENTAL INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

A man named Robert Coppage was crushed by a crane while at work. He was seriously injured and later received a huge settlement in a state court civil action against the company that inspected the crane. That company—Crane 1 Holdco, Inc.—is the plaintiff in this insurance coverage dispute. Crane1 claims that one of its insurers, Defendant Continental Insurance Company, must cover the damages it paid to Mr. Coppage to settle the state court case.

The parties have filed cross-motions for partial summary judgment. The controversy stems from the meaning of a two-word phrase in a written insurance contract: "professional services." Specifically, the issue is whether the professional services exclusion in the Continental policy excludes coverage for the crane inspection services Crane1 provided. For the reasons that follow, I believe Crane1 did not provide

"professional services" as that term is used in the policy, the exclusion therefore does not apply and Continental is on the hook to provide coverage.

## Factual Background

This case arises out of an insurance coverage dispute between Crane1 and its insurer, Continental Insurance Company, regarding Continental's failure to indemnify Crane1 in connection with the settlement of an underlying bodily injury lawsuit captioned *Robert Coppage v. Crane 1 Services, Inc.,* previously pending in the State of Indiana, Lake Superior Court Civil Div., Cause No: 45D04-1812-CT-875 (the "Coppage Action"). The Coppage Action alleged that Crane1, among others, negligently modified, maintained, inspected, and/or repaired an overhead crane, which led to Mr. Coppage sustaining grave bodily injury while using the crane at Niagara LaSalle Corporation's plant.

Crane1 performs visual inspections of cranes for its customers. [DE 133 at 2.][1] Niagara LaSalle Corporation hired Crane1 to perform periodic crane inspections at its plant here in Hammond. *Id.* The Coppage Action alleged that Mr. Coppage was injured on January 12, 2017, while using an overhead crane at Niagara's plant. *Id.* That action alleged Crane1 was negligent in its modification, services, maintenance, inspection, and/or repair of that crane. *Id.* Specifically, the first amended complaint in that action alleged Crane1 and its employees engaged in the modification, retrofitting,

---

[1] Page citations in this opinion are to the CM/ECF page numbers found in blue at the top of each document.

2

sale, service, maintenance, inspection, repair and certification of the subject overhead crane and its remote control and component parts, and had the duty to ensure the crane and remote control were in a safe, code compliant and proper working condition and could properly and safely be used by Niagara employees. [DE 145 at 2.]  The first amended complaint further alleged that Crane1 and its employees were negligent, grossly negligent, reckless, willful and/or wanton in the modification, retrofitting, sales, service, maintenance, inspection, repair and certification of the crane and its remote control and the component parts, and in assigning, training, supervising, overseeing and managing its crews regarding the same.  *Id.*

Crane1 tendered the Coppage Action to its insurers, including Travelers Indemnity Company of America and Defendant Continental, requesting defense and indemnity. [DE 133 at 2.]  Travelers issued Crane1 a primary general liability insurance policy, with an effective period of October 7, 2016 to October 7, 2017, and policy limits of $1,000,000 per occurrence and $2,000,000 in the aggregate. [*Id.* at 3.]  Travelers provided Crane1 with its policy limits for the Coppage Action and is not a defendant in this action. *Id.*

Continental issued a first layer excess liability policy to Crane1, that sits immediately above the Travelers Policy, with an effective period of October 7, 2016 to October 7, 2017 and policy limits of $10 million per occurrence and $10 million in the aggregate.  *Id.*  The Continental Policy provides coverage in excess of the Travelers Policy.  *Id.*  The Continental Policy excludes "any liability arising out of the actual or

3

alleged rendering of, or failure to render, any professional services by the Insured or any other person for whose acts the Insured is legally responsible." [*Id.* at 4.] This "professional services exclusion" does not define the term "professional services." *Id.* The Continental Policy also included a Contractors Limitation Endorsement dealing with architects and engineers. This particular portion of the policy specifically excluded "Professional Services" provided by Crane1 "Architects and Engineers." [*Id.* at 4-5.] The "Architect and Engineers Professional Services" exclusion includes a comprehensive definition of the types of professional services that are meant to be excluded from coverage, including inspection services. (*Id.*)

On December 16, 2020, Continental issued its first reservation of rights letter to Crane1, stating "consistent with the [Professional Services Exclusion], Continental reserves the right to disclaim coverage if it is determined that plaintiff's claims against Crane1 arise out of the rendering or failing to render professional services." [*Id.* at 6.] On July 20, 2021, Continental issued a second reservation of rights letter to Crane1 again reiterating its position that coverage was potentially excluded because of the Professional Services Exclusion. *Id.* On January 19, 2022, Continental issued a third reservation of rights reiterating their position, and for the first time also raising the other "professional services" exclusion in the policy — the above described Contractors Limitation Endorsement — as another basis to potentially deny coverage. *Id.*

On January 25, 2022, Continental told Crane1 that it had elected to participate in the defense of the Coppage Action and had retained Attorney Dominick Savaiano as

4

defense counsel. *Id.* Attorney Savaiano defended Crane1 in the Coppage Action and was being paid by both Travelers and CNA. *Id.* On February 8, 2022, Continental issued a fourth reservation of rights letter to Crane1 reiterating its position on the Professional Services Exclusion and the Contractors Limitation Endorsement as another basis to potentially deny coverage. [*Id.* at 6-7.]

Although the allegations in the amended complaint against Crane1 were quite broad on the plaintiffs' theory of liability, after discovery was completed and the Coppage Action was set for trial, the plaintiffs' focus became more narrow. For example, discovery revealed that Crane1 was not negligent in its repairs of the subject crane because they had only made three minor repairs on the crane, none of which had anything to do with the cause of the crane's catastrophic failure. [DE 145 at 3.] So that theory was essentially abandoned by the Coppage plaintiffs. Instead, as the parties prepared for trial in the Coppage Action, it became clear that the plaintiffs' theory of liability was that Crane1 was negligent in its inspections of the subject crane, and that is what caused Mr. Coppage's injuries. This narrowing of their theory of liability is best shown by the expert disclosures that were made by the plaintiffs in the Coppage Action as well as the deposition given by the plaintiffs' expert. [DE 147-3 at 2-5; DE 147-2 at 4-10.]

After four years of active litigation in the state case, the Coppage Action ultimately settled in August 2023 on the eve of trial. [DE 145 at 2.] Here's how the settlement came about. A mediation was scheduled in the Coppage Action and Crane1

told Continental it expected their participation. [DE 133 at 7.] The mediation took place on March 14, 2022, with Crane1, Travelers, and Continental all in attendance. *Id.* However, Continental failed to make any settlement offers during the mediation. *Id.*

On April 18, 2023, Continental emailed Crane1, asserting "the facts developed during litigation together with plaintiff's liability expert reports and their deposition testimony support [Continental's] coverage position. Based upon the foregoing, it is unlikely that plaintiff would be receptive to settling for any nominal amount [Continental] would be willing to contribute above the Travelers and Lloyds policy limits." *Id.* For context, Lloyds issued a professional liability insurance policy to Crane1 providing coverage for sums in excess of the deductible that Crane1 is legally obligated to pay as damages as a result of a claim by reason of an act or omission, including personal injury in the performance of professional services by Crane 1. [DE 145 at 4.] Lloyds was initially a defendant in this case, but pursuant to a settlement agreement with Crane1, Lloyds was voluntarily dismissed from this action on December 30, 2024. [DE 101.] Anyway, Crane1 claims Continental's failure to make any meaningful settlement offer and an expiring settlement demand forced Crane1 to settle the Coppage Action, for an amount above the Travelers Policy limit but within the Continental Policy limit, and fund a significant portion of the settlement by itself. [DE 133 at 9.]

## Discussion

Crane1 filed this lawsuit in state court and the case was removed on the basis of

6

diversity of citizenship. The third amended complaint, filed April 14, 2025, leaves Continental as the only defendant remaining in this litigation. [DE 132 at 9; DE 128.] The third amended complaint states four claims: Count I is for declaratory judgment asking for a declaration that the Continental Policy provides coverage to Crane1 for the Coppage Action immediately following the exhaustion of the Travelers Policy; Count II is for breach of contract; Count III is for violation of the implied duty of good faith and fair dealing; and Count IV is for reformation based on mutual mistake as to Continental. [DE 128.] On January 11, 2024, Continental filed a motion to stay discovery on Crane1's count for violation of the implied duty of good faith (which was Count V of the Second Amended Complaint, and became Count III in the Third Amended Complaint) [DE 62] which this Court granted [DE 63].

Crane1 filed the instant motion for partial summary judgment seeking a declaration that the Professional Services Exclusion in the policy does not preclude coverage. [DE 131.] Continental filed a cross-motion for summary judgment, seeking summary judgment on Count I and Count II of the third amended complaint. [DE 144.] Finally, Crane1 filed a motion to file a fourth amended complaint to add an additional cause of action for reformation based on unilateral mistake. [DE 176.] This motion remains pending, but the parties agree it does not affect the partial motions for summary judgment since those are based only on the declaratory judgment claim. I held a hearing on the motions for summary judgment on October 21, 2025, and the parties provided very helpful argument.

### I.    Motions to Strike

At the outset, I note that Defendant Continental filed motions to strike two of Crane1's experts: a motion to strike and bar the expert report of Stephen D. Johnson [DE 129] and a motion to strike and bar the expert report of Ted. L. Blanton [DE 130]. Mr. Blanton opines that the inspection forms used by Crane1's inspectors do not require the inspector to have the specialized level of knowledge that crane maintenance personnel or a crane engineer would possess. [*Id.* at 1-2.] He also concludes that Crane1's inspectors need only have a general understanding of the crane's electrical, mechanical and structural systems, and didn't have training in maintenance. [DE 130-1, Blanton Report, at 8.] Finally, he opines about the average hourly rate for a crane inspector in the United States (approximately $23.00/hour), versus crane maintenance personnel (upwards of $45/hour), and a qualified crane design engineer (a yearly salary of $95,000-$150,000). [*Id.* at 7.]

In its motion to strike Dr. Blanton, Continental claims there is nothing in the report that assists the jurors to understand the evidence or determine a fact at issue. [DE 130 at 3.] Continental cites to direct evidence of the work actually performed by Crane1's inspectors, so claims Blanton's generalized description of the work performed by them isn't helpful. [DE 130 at 3-4.]

Continental has also moved to strike and bar the expert report of Stephen D. Johnson. [DE 129.] Mr. Johnson is an attorney and insurance expert who claims that Continental was below industry standards in its investigation, evaluation of coverage,

and communication of its coverage positions to Crane1 for the Coppage Claim.
[Johnson Report, DE 129-1 at 16.] Johnson also looked at the ordinary definition of
"professional services" and opined that there is no evidence Crane1 deployed
professionals such as engineers or other highly trained and educated people. [*Id.* at 18.]
Continental argues that an expert should not provide an opinion on the ultimate
conclusion of law, or whether Crane1's crane inspection constituted a "professional
service" under the Policy's professional services exclusion. [DE 129 at 3-4.]

Because I have not relied upon any of this evidence (the expert report of Stephen
Johnson or the export report of Ted Blanton) in my decision in this case, I will deny
these motions as moot.

## II.    Cross Motions for Summary Judgment

Summary judgment must be granted when "there is no genuine dispute as to
any material fact and the movant is entitled to judgment as a matter of law." FED. R.
CIV. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a
reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty
Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On cross motions for summary judgment, I need to assess whether each movant
has satisfied the requirements of Rule 56. *See Cont'l Cas. Co. v. Nw. Nat'l Ins. Co.*, 427
F.3d 1038, 1041 (7th Cir. 2005); *McKinney v. Cadleway Props., Inc.*, 548 F.3d 496, 504 n. 4
(7th Cir. 2008). "As with any summary judgment motion, [the Court] review[s] cross-
motions for summary judgment construing all facts, and drawing all reasonable

inferences from those facts, in favor of the non-moving party." *Laskin v. Siegel*, 728 F.3d 731, 734 (7th Cir. 2013) (internal quotation marks omitted).

Let's first set out the law governing this matter. Both parties agree that Indiana law applies to the present dispute. [DE 132 at 15; DE 146 at 16 n.2.] "Under Indiana law, the interpretation of an insurance policy presents a question of law to be decided by the court." *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 40 F.3d 146, 151 (7th Cir. 1994). "[T]he interpretation of an insurance policy, as with other contracts, is primarily a question of law for the court, even if the policy contains an ambiguity needing resolution." *Tate v. Secura Ins.*, 587 N.E.2d 665, 668 (Ind. 1992). "It is only where a contract is ambiguous and its interpretation requires extrinsic evidence that the fact finder must determine the facts upon which the contract rests." *Id.* In Indiana, an "insurer bears the burden of demonstrating that any exclusion applies." *Westfield Ins. Co. v. S&L Builders, LLC*, 558 F.Supp.3d 711, 715 (N.D. Ind. 2021).

Under Indiana law, "contracts for insurance are subject to the same rules of interpretation as are other contracts." *Allstate Ins. Co. v. Dana Corp.*, 759 N.E.2d 1049, 1054 (Ind. 2001) (quotation omitted). The goal of contract interpretation under Indiana law is to determine the parties' intent. *Tender Loving Care Mgmt., Inc. v. Sherls*, 14 N.E.3d 67, 72 (Ind. Ct. App. 2014). For this reason, an unambiguous contract "should be given its plain and ordinary meaning." *RLI Ins. Co. v. Conseco, Inc.*, 543 F.3d 384, 390 (7th Cir. 2008). Where the terms of a contract are clear and unambiguous, they are conclusive, and the court will not construe the contract or consider extrinsic evidence. *Eckart v.*

10

*Davis*, 631 N.E.2d 494, 497 (Ind. Ct. App. 1994). A contract is not ambiguous merely because the parties disagree as to its proper construction. *Vincennes Univ. ex rel. Bd. of Trs. of Vincennes v. Sparks*, 988 N.E.2d 1160, 1165 (Ind. Ct. App. 2013). Additionally, failure to define a term in an insurance policy does not necessarily make it ambiguous. *Stevenson v. Hamilton Mut. Ins. Co.*, 672 N.E.2d 467, 471 (Ind. Ct. App. 1996).

A contract will be found to be ambiguous only if reasonable persons would differ as to the meaning of its terms or find it susceptible to more than one construction. *Id.* "[W]here the language of an insurance policy is ambiguous, in that it is susceptible to more than one reasonable interpretation, the court must construe the language in favor of the insured." *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 40 F.3d 146, 151 (7th Cir. 1994). In looking at a contract, I must read it as a whole — the meaning of a contract is ascertained from considering all of its provisions, not from just looking at individual words, phrases, or paragraphs alone. *Evansville-Vanderburgh Sch. Corp. v. Moll*, 344 N.E.2d 831, 837 (Ind. 1976); *Whitaker v. Brunner*, 814 N.E.2d 288, 294 (Ind. Ct. App. 2004) ("We read the contract as a whole and will attempt to construe the contractual language so as not to render any words, phrases, or terms ineffective or meaningless."). Similarly, if it is reasonable, I must accept a construction of a contract that harmonizes all of its provisions (rather than a construction that causes the provisions to conflict). *Four Seasons Mfg., Inc. v. 1001 Coliseum, LLC,* 870 N.E.2d 494, 501 (Ind. Ct. App. 2007).

Applying these principles, my first task is to determine if the contract is

11

ambiguous. A court may determine whether the meaning of a term or word in a contract is ambiguous as a matter of law. *Loudermilk v. Casey*, 441 N.E.2d 1379, 1383 (Ind. Ct. App. 1982). Then, "[i]f the court finds any term is ambiguous, then the parties may introduce extrinsic evidence of its meaning, and the interpretation of that term becomes a question of fact." *Id.*

Let's recap the important provisions that are in dispute in the Continental insurance contract. First, here is what the "Professional Services" exclusion says:

It is understood and agreed as follows:

I.      If this endorsement is attached to the:

A.      PARAMOUNT EXCESS AND UMBRELLA LIABILITY POLICY, then under EXCLUSIONS, the section entitled **Cover A - Excess Follow Form Liability and Coverage B - Umbrella Liability Exclusions**; . . .

is amended by the addition of the following new exclusion:

**Professional Services**

any liability arising out of the actual or alleged rendering of, or failure to render, any professional services by the **Insured** or any other person for whose acts the **Insured** is legally responsible.

[DE 127-2 at 72 (emphasis in original).] As one can see, the term "Professional Services" as used in this is part of the policy is not defined. The decision to not define the term "Professional Services" is one that was made by the drafter of the policy— Continental.

As noted above, in addition to the standalone "Professional Services" exclusion just discussed, there is also a provision that is called "the Contractors Limitation Endorsement" which states as follows:

It is understood and agreed as follows:

I.      Under **EXCLUSIONS**, the section entitled **Coverage A - Excess Follow Form Liability and Coverage B - Umbrella Liability Exclusions** is amended by the addition of the following new exclusion:

**Architects and Engineers Professional Services**

any liability of the **Insured**, or any other person or entity acting on the **Insured's** behalf, arising out of any actual or alleged rendering of, or failure to render, professional services by an architect, engineer, surveyor, landscape architect, or soil or subsoil analyst.

As used in this endorsement, professional services includes, but is not limited to:

a.      feasibility studies, cost estimates, or soil tests;

b.      preparing, approving, or failing to prepare or approve, maps, plans, opinions, reports, surveys, change orders, field orders, designs, drawings, shop drawings or specifications;

c.      supervisory, inspection, architectural or engineering activities; or

d.      project or construction management services.

[DE 127-2 at 76 (emphasis in original).] As is apparent from the language of this exclusion, Continental saw fit in this instance to specifically define what it meant by the term "Professional Services" in relation to work done by architects and engineers.  And that definition specifically includes "inspections" done by those types of professionals.

In looking at the contract, Crane1 argues the inclusion of both the Professional Services Exclusion and the Contractors Limitation Endorsement makes the Policy redundant and ambiguous. [DE 132 at 20-21.]  In that regard, Crane1 points out the fallacy of Continental's position.  According to Continental, Crane1's inspection services

13

fall within the Professional Services Exclusion because *all* inspections, no matter who performs them, are professional in nature. But as Crane1 notes, such an interpretation renders the express inclusion of the term "inspections" within the Contractors Limitation Endorsement's definition of "professional services" superfluous and meaningless. [*Id.* at 19.] In other words, if all inspections (regardless of who conducted them) were going to be excluded by the policy, why then also expressly incorporate the contractors limitation defining professional services of architects and engineers? Finally, Crane1 argues that Continental's inclusion of "inspection activities" within the Contractors Limitation Endorsement demonstrates that Continental knew how to define "professional services" to include "inspections." The fact that Continental intentionally failed to define that term in the professional services exclusion should be narrowly construed against Continental as the drafter of the policy. [DE 132 at 22-23.]

All of these canons of contract construction are valid arguments that I have considered, and they are all sensible. But ultimately, this case comes down to whether the actual inspections performed by Crane1 inspectors can be considered "professional services." To be frank about it, this is a *very* close case. I have read the cases cited by both parties and done independent research. There is a panoply of cases on this issue of trying to decide whether certain actions fit under a "professional services" exclusion where the insurer chooses not to define that term. These cases, while instructive and helpful, are also not directly on point to the work Crane1 actually performed here. In other words, in the absence of any definition in the policy, I'm a bit at sea when

14

attempting to answer the pivotal, but amorphous question: Is someone who is providing crane inspections performing a "professional service"?

The answer to that question must begin with an understanding of what the Crane1 inspectors actually did. So I'll start by examining the testimony presented by the parties about the nature of the inspectors' work, what their education was, and the training they received. Tom Boscher, who was the President and CEO of Crane1 and Crane1's Rule 30(b)(6) designee, testified during his deposition that "crane inspections are a core part of Crane1's business. They're done by high school educated, GED, you know, learned on the job." [DE 132-1 at 4.] Mr. Boscher did not believe it was "a professional activity whatsoever." *Id.* He went on to explain that Crane1 did routine inspections, and repairs and maintenance. [*Id.* at 5.] According to Boscher, during the monthly inspections on the LaSalle account, "two or three people would go to the site and inspect the cranes on-site and follow the checklist and note anything that might be in need of repair." *Id.* When asked to describe a routine inspection, Boscher replied:

> It is a visual and operating test of a crane. So generally they stand on the ground. They operate the crane in all directions. They operate the hoist in all directions. They operate the trolley in all directions. And they're visually inspecting, you know, a checklist that they have in front of them that talks about are there any excessive wear and tear, and abnormal sounds, smells, you know, things like that.

[*Id.* at 6.]

When the Crane1 inspectors were conducting their inspections, they also had a one page sheet of paper that they completed and filled out that listed various parts of

the crane and if they were found to be in satisfactory or unsatisfactory condition upon visual and operational inspection. [*Id.* at 7.]  According to Boscher, on occasion the crane inspector met with the customer to talk through observations and recommendations, but specifically as to the crane at issue in this case, the Crane1 inspectors did not have the authority to initiate or make repairs on that crane if they saw an issue, and they did not have the authority to take it out of service. [*Id.* at 7-8.]  Rather, the inspectors make recommendations to the customer (Niagara LaSalle in this case) about items that needed to be repaired. [*Id.* at 8.]  Continental agrees that "[t]he inspectors were not even authorized to make repairs to the cranes at Niagara LaSalle without separate approval by Niagara LaSalle, and Niagara LaSalle usually had a different company make any repairs recommended by Crane1's inspectors." [DE 146 at 18.]

Boscher went on to explain there are two kinds of inspections — a periodic inspection and a more frequent one — the frequent inspections are done from the ground and the periodic inspection is where an inspector will get up on a lift and get close to the crane, but they are both visual inspections, and no repairs are being made. [DE 132-1 at 10.] According to Boscher, an inspector might be authorized to top off the oil, or something very small, but that is it. [*Id.* at 10-11.]

Tim Boyd was one of the inspectors who did work on the crane in question, crane 55A.  During his deposition he testified that crane inspectors did not need to have the OSHA 30 certification. [DE 132-2 at 3.]  He never assessed safety code complaints on the crane. [*Id.* at 4.]  Boyd testified that he "check[ed] roughly or quickly for

16

connections.  We may touch a screw with our hands and see if the wire is loose.  But as far as laying a screwdriver on it, no." *Id.*  Boyd is not a trained or certified mechanic, nor is he a trained or certified electrician. [*Id.* at 6.]  Boyd said he was an "inspector" but he isn't a "certified inspector" because he believed one would have to go through classes to receive that. [*Id.* at 6-7.]  Additionally, when asked "[w]hen you would do an inspection and identify a deficiency, would you troubleshoot to see exactly what repair would need to happen, or were you just documenting any deficiency?" Boyd answered unequivocally that he would "just document" the deficiency. [DE 150-4 at 3.]

Richard Smith was another crane inspector for the crane that was involved in the accident.  When asked specific questions about whether or not a crane complied with code, he answered, "I don't know the standards, I don't know the codes, I'm not an electrical engineer.  Therefore, I would assume our guys are trained to what is proper." [DE 132-3 at 3.]  And when asked whether Niagara hired Crane1 to do an engineering assessment review, he answered that it did not. [*Id.* at 4.]

This testimony alone really drives the conclusion that Crane1's inspectors were not conducting "professional services."  They were high school or GED educated individuals who largely conducted basic visual inspections and operating tests of cranes.  They were not capable of conducting any repairs if they spotted an issue— rather, they completed a fairly rudimentary check-list indicating whether certain parts of the crane were "satisfactory" or "unsatisfactory." [*See* example of periodic inspection report, DE 147-8 at 5.]  And importantly, they did not analyze any data or interpret any

results of the inspection.

Having this background in mind about what the Crane1 inspectors actually did, let's turn to some of the relevant caselaw. For like-comparison purposes, it is crucial to start with cases that dealt with similar types of inspections, and an insurance policy that did not define "professional services."

*Maxum v. Indemnity Co. v. Certified Elec. Testing*, No. 10-cv-681-MJR-DGW, 2011 WL 13234719 (S.D. Ill. Sept. 29, 2011), is an Illinois case relying upon North Carolina law, but it's worth examining because the underlying facts are pretty analogous to this case. In *Maxum*, the court had to decide whether a professional liability exclusion applied to exclude coverage for an accident where the injured party was operating a hydraulic boom at work. The company in that case provided mechanical inspection of the hydraulic boom. There was evidence the inspections were "mechanical in nature, involving the removal of various portions of machinery so that parts may be identified, and information about those parts can be provided to the owners of the equipment." *Id.* at *6. The personnel were not engineers or designers of machinery, and they did not provide opinions regarding the appropriate design or utilization of the machinery. *Id.* There was no evidence that the inspections "necessarily entail[ed] some degree of expertise." *Id.* While that court recognized that North Carolina law narrowly interpreted the professional services exclusion, it concluded that the inspection of the hydraulic boom was not covered by the professional liability exclusion because the inspection did not require specialized knowledge or skill, and there was no professional

18

relationship akin to a physician-patient or attorney-client relationship. *Id.*

Another factually similar case is *Essex Ins. Co. v. Ragland Mills, Inc.*, No. 06-0737-CV-W-FJG, 2008 WL 351014 (W.D. Mo. Feb. 6, 2008). *Ragland* involved a firefighter who was injured on a manlift. The defendant was accused of failing to properly inspect the manlift. The insurance policy contained a professional service exclusion but the term was not defined. Acknowledging the familiar tenets that ambiguous language must be construed against the insurer, as must exceptions and limitations in the coverage, the court concluded the exception did not apply. To become an official inspector, only a five-day course was required, and most of the other training for inspection of manlifts occurred on the job. *Id.* at *9. The *Ragland* Court reasoned:

> The Court concludes that the service of elevator inspectors is not a professional service. The policy at issue does not even define what is a professional or professional service. Thus, the ambiguity in the policy about what constitutes a professional must be construed against the insurer.

*Id.* at *10.

In continuing to look at factually similar cases, the court in *Aerothrust Corp. v. Granada Ins. Co.*, 904 So.2d 470 (Fla.3d Dist. Ct. App. 2005), concluded a professional services exclusion that was broadly defined to include services like legal, accounting, engineering, drafting, supervisory, inspection, or appraisal services, did not apply to a hoist inspector. The Court reasoned:

> It is apparent from the types of services listed that the services which are meant to be excluded as professional are those which require specialized training. This is consistent with the general definition of "professional." *See Black's Law Dictionary* 1246 (8th ed.

19

> 2004) (defining "professional" as "[a] person who belongs to a
> learned profession or whose occupation requires a high level of
> training and profeiciency."). Therefore, in accordance with the
> doctrine of *noscitur a sociis*, although the exclusionary list includes
> "inspection . . . services," only those inspection services which
> require specialized training should be considered professional
> services. In an affidvait, Sunshine's president stated that personnel
> who perform inspections on cranes and hoists such as those
> performed by Aerothrust are not required to have any specialized
> training or experience, or even a college or high school diploma.
> He further stated that there is no entity that certifies or accredits
> people who perform such inspections, or that regulates or sets forth
> standards for such personnel. Under these circumstances, the
> inspection and maintenance of hoists is not a professional service
> within the meaning of the professional services exclusion.

*Id.* at 472. Like the inspectors in the *Aerothrust* case, Crane1's inspectors were not

required to have any specialized training or experience, and they were high school

educated or the equivalent. And because the insurance policy in this case did not define

the term "professional services" at all (versus *Aerothrust* which at least contained a

broad definition), Crane1 has an even stronger case for coverage—meaning the

professional services is inapplicable—than the *Aerothrust* plaintiff.

There are other cases, too, that are not as factually analogous, but nevertheless

are interesting to consider as they also grapple with whether an action is a professional

service in a contract where that term is undefined. For example, in *Auto-Owners*

*Insurance Company v. E.N.D. Servs., Inc.*, 506 F. App'x 920 (11th Cir. 2013), the Eleventh

Circuit found home inspection services fell under a professional services exclusion. But

this case is easily distinguishable as the *Auto-Owners* court recognized that industry

standards existed for home inspections and to comply with those standards a home

inspector needed specialized skills and training, the inspection agreement itself stated it would comply with ASHI Standards, and the inspector in that case received significant on the job training. The court seemed to easily reach the conclusion that inspecting a home "require[d] specialized skills and training." *Id.* at 927. If anything, this case highlights the difference between an inspection done by a specialized person with certain skills, training, and applicable industry standards like in *Auto-Owners*, and the inspectors for Crane1 who did not need to possess specialized education or training and there were no applicable regulations.

Another distinguishable case involving an insurance policy with no definition for professional services is *Laboss Transp. Servs. v. Global Liberty Ins. Co. of New York*, 208 F.Supp.3d 1268 (S.D. Fla. 2016). That case involved a wheelchair that was improperly secured into a transport van. The court stressed "[w]hether an act results from the nature of a professional service is determined by focusing upon the particular act itself, as opposed to the character of the individual engaging in the act." *Id.* at 1276. So because the person was not providing medical services at the time, but rather just securing a wheelchair, the court determined the non-emergency transportation of a passenger did not rise to the level of professional services under the policy's exclusion. *Id.* at 1277-78.

Turning to cases decided in this district, one case cited by Continental, *Neighborhood Housing Servs. of America, Inc. v. Turner-Ridley*, 742 F.Supp.2d 964 (N.D. Ind. 2010), involved servicing mortgage loans. The term professional services was not

21

defined in that policy either, so the Court started with looking at Indiana's

interpretation of the term:

> In Indiana, "professional services" means 'any business activity
> conducted by the insured which involves specialized knowledge,
> labor or skill and which is predominantly mental or intellectual as
> opposed to physical or manual in nature." *Terre Haute National
> Bank v. Pacific Employers Ins. Co.*, 634 N.E.2d 1336, 1339 n.2 (Ind. Ct.
> App. 1994). "Not every action a professional takes in the course of
> providing professional services will be a professional service for
> insurance purposes, but that when the professional draws upon his
> or her professional knowledge, experience, and training in taking
> some action, that is a professional service for insurance purposes."
> *Erie Ins. Group v. Alliance Environmental, Inc.*, 921 F.Supp. 537, 546
> (S.D. Ind. 1996). Thus, when "the insured is being sued for taking
> actions in the course of providing professional services, and where
> those actions both are reasonably related to the services being
> provided and involve the use of (or failure to use) professional
> knowledge, skill, experience, or training, the 'professional' services
> exclusion applies." *Id.* at 547.

*Id.* at 971. This logic strikes me as circular, and just not particularly helpful to the

instant situation. It isn't surprising that the *Neighborhood* court found servicing loan

mortgage payments was a professional service as they were alleged to have breached

the contractual duty to collect payments, segregate funds, maintain accurate records,

and make accurate reports of loan payoffs. *Id.* at 971. The actions were not merely

physical, manual or clerical tasks, but rather required the defendants to draw upon their

specialized knowledge, experience, and training. *Id.* Again, this is different from the

Crane1 inspectors who were doing largely elementary visual inspections that did not

require specialized skill or education.

And then there is the case of *National Ben Franklin Ins. Co. v. Calumet Testing*

*Servs., Inc.*, 60 F.Supp.2d 837 (N.D. Ind. 1998), *aff'd* 191 F.3d 456 (7th Cir. Aug. 6, 1999),

which both parties discuss at length in the briefing.  In *Calumet Testing*, Judge

Springmann dealt with a similar situation of having to determine whether testing done

on a pressure tank by Calumet technicians qualified as "professional services" when

that exclusion failed to define the intended meaning of professional services.  *Id.* at 843-

44.  Calumet had three levels of technicians: "trainees" which were new employees and

needed on-the-job training; "level one" who were technicians permitted to do the actual

testing procedures but had to be supervised and could not interpret the test results; and

"level two" technicians that were required to pass a test and take recertification tests so

they could interpret the test results.  At issue in the case were the level two technicians

(the highest level) who "used a Panametrics thickness meter to measure the thickness of

the walls of a pressure tank located at the [ ] plant. . . . [and did] magnetic particle

testing on a weld."  *Id.* at 840.  After relying on the most-often quoted definition of

"professional service" in *Marx v. Hartford Acc. & Indem. Co.*, 157 N.W.2d 870 (1968),

which is a service involving "specialized knowledge, labor, or skill, and the labor or

skill involved is predominantly mental or intellectual, rather than physical or manual,"

and a similar definition in *Terre Haute*, Judge Springmann concluded the job performed

by the technician was a professional service:

> While the actual testing itself may be close to 'physical or manual,'
> the interpretation of that testing beyond question involves
> professional knowledge, experience, and training.  In order to
> interpret the test, [the technician] had to have extensive classroom
> instruction and 160 hours of on-the-job training.  His helper, a level
> one technician, could perform the tests, but could not interpret

them. *It is the interpretation of the test that caused Calumet to be sued.* This is a professional service . . . .

*Id.* at 846 (emphasis added). As I have emphasized in this quote, it was the *interpretation* of the test results that was a crucial part of the reasoning in *Calumet Testing,* and the main distinguishing factor.

In this case, the Crane1 technicians did not have extensive experience and training, and they did not have the ability to interpret the results of the inspection. They completed the inspection form, checked the various boxes, and then gave the form to Niagara LaSalle who then determined if they wanted to hire either Crane1 or another company to do any repairs. If anything, the Crane1 inspectors were similar to the level one technicians in *Calumet Testing.* And while Judge Springmann did not explicitly state the testing by a level one technician would not be a professional service (because that question was not before her), her reasoning certainly lends towards that conclusion.

One case cited with approval in *Calumet Testing,* and relied upon by Continental, is *Hollingsworth v. Commercial Union Ins. Co.*, 208 Cal.App.3d 800, 808 (Cal. Ct. App. 1989), where the piercing of a customer's ear resulted in serious injury and the court held that "in the context of a cosmetics business, ear piercing clearly constitutes a professional service as distinguished from an activity incidentally related to its everyday operations." *Calumet Testing* cited this case as example of how the focus of the analysis should be on the type of work performed, not necessarily on whether the type of work required a license or extensive training or technical skill (although, as quoted above, the *Calumet Testing* court *did* ultimately consider the training and skill of the

24

inspectors in that case). While I am somewhat dubious of the conclusion in *Hollingsworth* that ear piercing is a professional service (although maybe this is more reachable with the facts at hand involving a cosmetic company), even if I were to exclude from the analysis whether a license or extensive training was necessary for the Crane1 operators, in just looking at the work performed (visually looking at the wear and tear on a crane and manually testing the operation of the crane), I think the conclusion that this was not a professional service is still quite reachable.

As an aside, there is an issue Judge Springmann addressed in *Calumet Testing* that should also be acknowledged here. She recognized the distinction between "errors and omissions" or "professional malpractice" policies and general business liability policies. *Calumet Testing*, 60 F.Supp.2d at 844. Many other cases raise the same point. *See Citizens Ins. Co. v. America v. Panzica Building Corp.*, 507 F.Supp.3d 1047, 1052-53 (N.D. Ind. 2020) (quoting 9A *Couch on Insurance* § 129:1 (3d ed. 2005)); *Tri-Etch, Inc. v. Cincinnati Ins. Co.*, 909 N.E.2d 997, 1003 (Ind. 2009). Calumet had completed applications for professional services coverage with various insurance companies but, apparently because of cost, declined to purchase that kind of insurance. However, in this case, recall that Crane1 did purchase a professional liability policy from Lloyds. [DE 146 at 7.] The Lloyds policy defined professional services as "solely in the performance of crane inspections, safety compliance training, recommendations and consulting services for others for a fee." [DE 145 at 4.] As I mentioned earlier, Lloyd's was initially a defendant in this action but was voluntarily dismissed pursuant to a settlement

25

agreement.  Of course, the definition from the Lloyds Policy cannot be imputed into the

Continental Policy and there is no Indiana authority holding that errors and omissions

policies and general liability policies cannot overlap in coverage.  *See, e.g., Yousuf v.*

*Cohlmia*, 718 F.Supp.2d 1279, 1295 (N.D. Okla. 2010), *aff'd*, 741 F.3d 31 (10th Cir. 2014)

(analyzing coverage for a claim that triggered both general liability and professional

liability policies).  Continental argues that if I were to find the inspections at issue are

not professional services, that would effectively transform the Continental Policy into

an errors and omissions policy. [DE 154 at 12.]  But this is just not true.  I don't see why

Crane1 couldn't purchase an errors and omissions policy specifically for professional

services coverage, but also have the Continental general liability policy for situations

exactly like this—where a rudimentary visual inspection for basic wear and tear would

be covered.

　　　　To sum up: in considering the slant of the cases, I do think they lean towards a

finding that the Crane1 inspectors were not performing professional services.  Key to

this conclusion is the fact they did not implement specialized training or skill, interpret

any data, troubleshoot, or conduct any repairs.  Rather, the Crane1 inspectors

conducted routine visual inspections of the crane and manual operating tests like

testing the hoist and crane, and captured those results on a checklist.  This decision is all

the more reachable because Continental chose not to define "professional services" in

the policy, but did bother to define that term when it drafted its exclusion dealing with

architects and engineers.  This interpretation harmonizes all of the provisions of the

contract.

Before concluding, I'll return to a basic point the Seventh Circuit has made when construing exclusions in insurance policies. Under "Indiana law a condition or exclusion in an insurance contract . . . must *clearly and unmistakingly* bring within its scope the particular act or omission that will bring the condition or exclusion into play. Coverage will not be excluded or destroyed by an exclusion or condition unless clarity exists." *American National Ins. Co. v. Rose Acre Farms, Inc.*, 107 F.3d 451, 457 (7th Cir. 1997) (internal quotations omitted). The policy drafted by Continental in this case does not clearly and unmistakably bring the professional services exclusion into play. Therefore, because I find the professional services exclusion does not apply, Crane1 is due coverage under the applicable insurance policy.

## Conclusion

For the reasons articulated above, Plaintiffs' Motion for Partial Summary Judgment [DE 131] is GRANTED. The court hereby finds that the Professional Services Exclusion does not apply to the inspections at issue in this case. Judgment will be GRANTED in favor of Plaintiffs on Count I of the third amended complaint—the declaratory judgment count, but pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, I will withhold entry of judgment until all claims have been adjudicated.

Defendant Continental's Motion for Partial Summary Judgment [DE 144] is DENIED.

Defendant Continental's Motion to Strike and Bar the Expert Report of Johnson

[DE 129] and Blanton [DE 130] are both DENIED AS MOOT.

The parties are ORDERED to file a status report with this Court within 14 days of the date of this order setting forth their positions on what is left of the case and how it should proceed.

ENTERED: January 12, 2026.

/s/   Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT